**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **GAIL KING**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EQUIFAX INFORMATION SERVICES, LLC**<br>SERVE: Corporation Service Company, Reg. Agent<br>100 Shockoe Slip, FL 2<br>Richmond, VA 23219-4100<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br>SERVE: CT Corporation System, Reg. Agent<br>4701 Cox Rd., Ste. 285<br>Glen Allen, VA 23060-6808<br><br>**TRANS UNION, LLC,**<br>SERVE: Corporation Service Company, Reg. Agent<br>100 Shockoe Slip, FL 2<br>Richmond, VA 23219-4100<br><br>**and**<br><br>**CAPITAL ONE, N.A.**<br>SERVE: Corporation Service Company, Reg. Agent<br>100 Shockoe Slip, 2nd Floor<br>Richmond, VA 23219-4100<br><br>**Defendants.** | **Civil Action No.** 3:26-cv-825 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Gail King, by counsel, and for her Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc.

("Experian"), Trans Union, LLC ("Trans Union"), and Capital One, N.A. ("Capital One"), she states as follows:

**PRELIMINARY STATEMENT**

1. This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4. Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5. Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend

offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6. In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

7. If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id*. at 10.

8. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

9. The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply

parrot information they receive from entities like Capital One, particularly when a consumer makes a dispute about information reported.

10. Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the parties furnishing the information. Here, those entities include Capital One (the "Defendant Furnisher"), Synchrony Bank, Philadelphia Police & Fire FCU, Trumark Financial CU, Citibank, Discover Card, and JPMCB (collectively, the "Furnishers"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

11. Plaintiff brings claims under Section 1681e(b) against Equifax, Trans Union and Experian because each reported inaccurate and defamatory information about Plaintiff arising from fraud, including fraudulent charges an identity thief made on several of Plaintiff's accounts with the Furnishers and information regarding a Citibank loan that was opened fraudulently in Plaintiff's name. When Plaintiff disputed the inaccuracies, Equifax, Trans Union, and Experian did not reasonably investigate, also violating Section 1681i.

12. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Trans Union, and Experian have complied with their over 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Trans Union and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-

creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

13. Likewise, Defendant Furnisher Capital One violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Capital One did was consult its own records regarding the accounts and confirm to the agencies the inaccurate information it was already reporting. Capital One failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice that Plaintiff is a victim of identity theft.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

15. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) and (2). Each Defendant is subject to personal jurisdiction in this District and therefore resides here for purposes of venue, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District and the Richmond Division.

16. Defendant Furnisher Capital One maintains an extensive and longstanding presence within the Richmond Division. Capital One's principal operations center in the Richmond area is its West Creek campus, located in Goochland County, which is within the Richmond Division of this District. Capital One built the West Creek campus on a roughly 300-acre wooded site in order to consolidate approximately twenty separate Richmond-area facilities, and the campus comprises eight large office buildings.[1] Capital One has operated in Goochland County since 2000, and the West Creek campus is one of the company's primary operations centers, housing more than 5,000

---

[1] VHB, Capital One West Creek Campus, https://www.vhb.com/real-estate/office/capital-one-west-creek-campus/ (last visited Aug. 3, 2026) (documenting Capital One's 300-acre West Creek site, the consolidation of 20 separate Richmond-area facilities, and eight office buildings).

associates.[2] Capital One is also one of the largest private employers in the Richmond region.[3] On information and belief, Capital One's operations concerning the extension of consumer credit and the acquisition and use of consumer reports, including the conduct at issue in this action, are carried out in substantial part through its Richmond-area operations.

17. Capital One accordingly resides in, is at home in, and conducts systematic and continuous business within the Richmond Division.

18. Each of the CRAs repeatedly reported inaccurate information regarding Plaintiff that was furnished by Capital One.

19. Additionally, when Plaintiff disputed that information with the CRAs, each of the Defendant CRAs sent Plaintiff's disputes to Capital One and then blindly "parroted" back information that it received from Capital One, without conducting its own reinvestigation.

## PARTIES

20. Plaintiff is a natural person and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

21. Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

22. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information

---

[2] Capital One, Goochland County Economic Development, https://www.goochlandforbusiness.com/192/Capital-One (last visited Aug. 3, 2026) (Capital One has been located in Goochland County since 2000, and the West Creek campus is one of the company's primary operations centers, with more than 5,000 associates).

[3] Capital One and Genworth Financial, 2 of Richmond Area's Largest Private Employers, Postpone Plans to Return to the Office Until Next Year, Richmond Times-Dispatch (reprinted at roanoke.com), https://roanoke.com/news/state-and-regional/capital-one-and-genworth-financial-2-of-richmond-areas-largest-private-employers-postpone-plans-to/article_c8bcf2dd-3741-506c-9787-1b39b9b13395.html (last visited Aug. 3, 2026).

concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

23. Equifax disburses consumer reports to third parties under contract for monetary compensation.

24. Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

25. Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

26. Experian disburses consumer reports to third parties under contract for monetary compensation.

27. Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

28. Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

29. Trans Union disburses consumer reports to third parties under contract for monetary compensation.

30. Capital One, N.A. ("Capital One" or "Defendant Furnisher") is a national banking association organized under the laws of the United States, with substantial operations in the Commonwealth of Virginia, including in the Richmond, Virginia area.

31. Capital One is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

32. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

33. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

34. Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

35. Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

36. Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

37. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

38. It has long been the law that a CRA, such as Equifax, Trans Union or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

39. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The court held that Trans Union's

reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

40. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

41. Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that the CRA Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

42. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[4]

***Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Capital One to Perform a Detailed and Systematic Investigation of a Consumer's Dispute***

43. Today, furnishers such as Capital One have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

44. Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

45. "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").
>
> 357 F.3d 426, 430 (4th Cir. 2004).

46. Additionally, Capital One has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer

---

[4] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

***Plaintiff Discovers the CRA Defendants were Reporting Defamatory Information Resulting from Fraud on her Consumer Reports***

47. Plaintiff is a victim of identity theft.

48. Plaintiff first began to discover that she was a victim of identity theft in or about early 2024, when she attempted to electronically file her federal income tax return and the return was rejected because a return had already been filed using her Social Security number.

49. Upon reviewing her consumer reports, Plaintiff discovered numerous inflated balances that she had not incurred, including inflated balances on her accounts with Capital One, and a Citibank personal loan that Plaintiff had never opened.

50. One or more identity thieves made numerous fraudulent and unauthorized charges on Plaintiff's accounts with the Furnishers (including Capital One) without Plaintiff's knowledge or permission.

51. Plaintiff did not make, authorize, or benefit from the fraudulent charges on any of the Furnisher accounts.

52. Additionally, Plaintiff did not authorize or benefit from the Citibank personal loan in any way. Plaintiff had no knowledge of this loan, which had been opened fraudulently, until she discovered it reporting on her credit.

53. Plaintiff is not responsible for the inflated balance or the inaccurate late payments that resulted from the fraudulent charges on the Furnisher accounts.

54. Plaintiff is not responsible for any of the charges made on the Citibank personal loan.

55. On or about December 19, 2025, Plaintiff filed a report regarding the identity theft with the Middletown Township Police Department in Pennsylvania, which was assigned Incident No. 44-25-017120.

56. Plaintiff also prepared and submitted an Identity Theft Report and Affidavit to the Federal Trade Commission regarding the identity theft.

***Plaintiff Disputed the Inaccurate Information with the CRA Defendants Multiple Times***

57. On or about February 18, 2026, Plaintiff mailed a written dispute to Equifax via certified mail and explained that she is a victim of identity theft. Plaintiff enclosed a copy of her Federal Trade Commission Identity Theft Report and a copy of her police report.

58. In that letter to Equifax, Plaintiff disputed the following inaccurate account information:

| **Account Disputed** | **Inaccuracy/ Basis of Dispute** |
|---|---|
| 1. Capital One (QuicksilverOne), account ending 4039; balance $5,565 | Fraudulent charges resulting from identity theft; inaccurate balance and late-payment reporting. |
| 2. Capital One (Williams Sonoma), account ending 3850; balance $6,746 | Fraudulent charges resulting from identity theft; inaccurate balance and late-payment reporting. |
| 3. Capital One (Walmart Quicksilver), account ending 0293; balance $6,555 | Fraudulent charges resulting from identity theft; inaccurate balance and late-payment reporting. |
| 4. Capital One (BJ's), account ending 8004; balance $1,575 | Fraudulent charges resulting from identity theft; inaccurate balance reporting. |
| 5. Capital One (Kohl's), account ending 6938; balance $5,071 | Fraudulent charges resulting from identity theft; inaccurate balance and late-payment reporting. |
| 6. Capital One (Platinum), account ending 6343; balance $1,279 | Credit limit maxed by fraudulent charges resulting from identity theft. |
| 7. Synchrony Bank (Amazon), account ending 5030; balance $423 | Fraudulent charges resulting from identity theft; Synchrony processed a fraud refund. |
| 8. Philadelphia Police & Fire FCU, account ending 1703; balance $1,085 | Identity theft; closed at consumer's request; inaccurate late-payment reporting. |

| **Account Disputed** | **Inaccuracy/ Basis of Dispute** |
|---|---|
| 9. Trumark Financial CU, account ending 0003; balance $97,810 | Identity theft; credit line suspended; inaccurate late-payment reporting. |
| 10. Citibank, N.A. / CBNA (personal loan), account ending 2150; balance $24,381 | Account opened by the identity thief and never Plaintiff's; reported as a charge-off. |
| 11. Discover Card, account ending 6442; balance $7,734 | Identity theft; closed by credit grantor; inaccurate late-payment reporting. |
| 12. JPMCB / Chase (Freedom), account ending 4621; balance $0 | Inaccurate late-payment reporting on a zero-balance account. |
| 13. JPMCB / Chase (Disney), account ending 1066; balance $0 | Inaccurate late-payment reporting on a zero-balance account. |

59. On or about March 4, 2026, Plaintiff mailed written disputes to Experian and to Trans Union via certified mail, again explaining that she is a victim of identity theft. With both of these letters, Plaintiff included her Federal Trade Commission Identity Theft Report and her police report. Plaintiff disputed the same inaccurate information in her respective dispute letters to Trans Union and Experian as she disputed in her letter to Equifax.

60. On or about April 1, 2026, Experian sent Plaintiff the results of its "reinvestigation." Experian "Verified & Updated" the defamatory information that it was reporting on Plaintiff's credit regarding the Capital One accounts, the Discover Card account, and the two accounts with JPMCB. Defendant Furnisher Capital One continued to report inaccurate and derogatory information about Plaintiff to Experian.

61. On or about April 7, 2026, Trans Union sent Plaintiff the results of its "reinvestigation." Trans Union "Verified" the defamatory information that it was reporting on Plaintiff's credit regarding the Capital One accounts, the Discover Card account, and the two accounts with JPMCB. Defendant Furnisher Capital One continued to report inaccurate and derogatory information about Plaintiff to Trans Union.

62. Although Trans Union initially deleted the fraudulent Citibank personal loan account in response to Plaintiff's dispute, Trans Union later reinserted that account onto Plaintiff's consumer report without giving Plaintiff the proper notice, as required by 15 U.S.C. § 1681i(a)(5)(B)(ii).

63. On or about May 9, 2026, over 10 weeks after it received Plaintiff's dispute, Equifax sent Plaintiff the results of its "reinvestigation." Equifax "Verified" the defamatory information that it was reporting on Plaintiff's credit regarding the Capital One accounts, the Discover Card account, the two accounts with JPMCB, the Police & Fire FCU account, and the fraudulent Citibank personal loan account. Defendant Furnisher Capital One continued to report inaccurate and derogatory information about Plaintiff to Equifax.

64. Upon information and belief, Defendants did not correct all of the inaccurate and derogatory information on Plaintiff's consumer reports in response to Plaintiff's disputes, and instead continued to report the fraudulent information as accurate.

65. The Defendants' inaccurate reporting and failures to respond appropriately to Plaintiff's disputes devastated Plaintiff's credit.

66. Prior to Plaintiff's identity being stolen, there had never been any late payment reported on Plaintiff's credit.

67. Plaintiff has sent an additional round of disputes to the Defendant CRAs, however, as of the date of filing of this complaint, she has not received substantive responses.

***The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes***

68. Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor

located overseas. Equifax and Trans Union use a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

69. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[5]

70. Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

71. Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

72. Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

73. Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

---

[5] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

74. The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

75. In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian. The dispute is sent to the Defendant CRAs' creditor customers (such as Capital One and the other Furnishers) for their sole review and consideration.

76. Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

77. Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

78. Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

79. Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

***The CRA Defendants Forwarded Plaintiff's Disputes to Capital One, Who Did Nothing***

80. In each instance in which Plaintiff disputed the Capital One accounts with the CRAs, the CRAs forwarded Plaintiff's disputes to Capital One using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

81. On information and belief, e-Oscar is also the system by which Capital One has agreed it will accept consumer disputes from the CRAs.

82. Each time that Capital One received one of Plaintiff's disputes from a CRA, Capital One became obligated under the FCRA to investigate that dispute.

83. Capital One failed to reasonably investigate Plaintiff's disputes.

84. Despite Plaintiff providing Capital One with ample notice that she is a victim of identity theft and she does not owe the alleged debts, Capital One continued to report the Capital One accounts as "accurate" to the CRAs. Discovery will show that all Capital One did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

85. On dates better known to Equifax and Capital One, Equifax furnished Plaintiff's dispute to Capital One.

86. On dates better known to Experian and Capital One, Experian furnished Plaintiff's dispute to Capital One.

87. On dates better known to Trans Union and Capital One, Trans Union furnished Plaintiff's dispute to Capital One.

88. In response to Plaintiff's disputes, Trans Union "verified" the Capital One accounts as accurate, Equifax continued to report the Capital One accounts and noted that they had been "resolved by data furnisher," and Experian reported the accounts as "Account previously in dispute – investigation complete, reported by data furnisher." These responses confirm that the CRA Defendants communicated Plaintiff's disputes to Capital One.

89. Upon information and belief, the Defendant CRAs timely notified Capital One of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

90. By its actions as described herein, Capital One repeatedly furnished and communicated false credit information regarding Plaintiff.

***Capital One Had Actual Knowledge of the Fraud Even Before Plaintiff Disputed the Information with the CRA Defendants***

91. Well before Plaintiff disputed the fraudulent charges with the CRA Defendants, she notified Capital One directly that fraudulent, unauthorized charges had been made on her Capital One accounts, including the QuicksilverOne account ending in 4039 (the "Capital One Quicksilver Account").

92. On or about January 10, 2026, Plaintiff uploaded to Capital One's online portal the account statements on which she had identified the fraudulent transactions on her Capital One

accounts, and on or about January 14, 2026, she uploaded her identifying information to Capital One.

93. On or about January 21, 2026, Plaintiff sent Capital One a cease-and-desist letter by certified mail disputing the accounts and demanding that Capital One cease collection on the accounts. When tracking reflected that the letter did not reach Capital One's headquarters, on or about January 27, 2026, Plaintiff sent a second cease-and-desist letter to the address Capital One provided.

94. By early February 2026, Capital One had acknowledged Plaintiff's communications, opened case files for the disputed accounts, and processed Plaintiff's request to add her attorney, Nancy Kanter, as an authorized representative on the accounts (as reflected in letters sent by Capital One dated February 4, 2026).

95. Accordingly, no later than mid-February 2026—and before Plaintiff sent her disputes to the CRAs—Capital One had actual notice that the charges on Plaintiff's Capital One accounts were fraudulent and the result of identity theft.

96. Despite this actual, pre-existing knowledge, when the CRA Defendants later forwarded Plaintiff's disputes to Capital One, Capital One verified the defamatory information it was reporting as "accurate" rather than correcting it.

97. Capital One knowingly and recklessly verified information which it already had ample reason to know was fraudulent.

***Capital One Continues to Harass Plaintiff and Report Defamatory Information About Her***

98. On or about April 21, 2026, Plaintiff, through counsel, sent a written dispute to Capital One's collection agent, who was attempting to collect the fraudulent balance (and associated fees and interest) on the Capital One Quicksilver Account from Plaintiff. In the letter,

Plaintiff's counsel explained that Plaintiff is a victim of identity theft and that the entire disputed balance on her Capital One QuicksilverOne account ending in 4039 was the result of fraudulent charges she did not make. The letter included Plaintiff's Federal Trade Commission Identity Theft Affidavit and demanded that Capital One cease collection.

99. On or about June 1, 2026, Capital One notified Plaintiff that it had completed its investigation and found Plaintiff "responsible for this account," stating only that "[a]ctivity on the account indicates you opened and interacted with this account." Capital One did not conduct a reasonable investigation. Instead, it refused to correct its agent's unlawful attempts to collect amounts from Plaintiff that she did not owe, and it refused to correct or delete its inaccurate reporting.

100. On or about June 4, 2026, Capital One's collection agent advised Plaintiff's counsel that Capital One had found Plaintiff's fraud claim "invalid" and that it would resume collection proceedings on the Capital One Quicksilver Account.

***Plaintiff Suffered Actual Harm***

101. The Defendants continued to report the false Capital One information on Plaintiff's credit reports even after being notified that this information is false.

102. Upon information and belief, Defendants are *still* reporting fraudulent and defamatory information on Plaintiff's reports.

103. As a result of the inaccurate credit reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

a. Credit denial;

b. Strain on Plaintiff's marriage;

c. Harm to her credit scores and credit opportunities;

d. Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

e. Loss of time attempting to correct the inaccuracies;

f. Stress associated with attempting to resolve this matter; and

g. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: severe anxiety and depression, a need for increased medication, listlessness, crying spells, insomnia, humiliation and embarrassment, loss of privacy, and harm to reputation.

***Defendants' Conduct was Willful***

104. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

105. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

106. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

107. The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

108. Just in federal court alone, in the past decade alone, the creditor-furnishers disputed by Plaintiff and "verified" by the CRAs (Capital One, Citibank, Discover Card, & JPMCB) have had to defend approximately 7,700 consumer credit lawsuits.

109. In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

110. The CRA Defendants knew or should have known of this litigation history.

111. The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

112. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

113. Each Defendant regularly receives unredacted consumer dispute details from this database.

114. Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Equifax.

115. Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Trans Union.

116. Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Experian.

117. Further, over 360,000 of the CFPB complaints against Equifax, more than 370,000 complaints as to Trans Union, and over 360,000 complaints about Experian were based largely on their failures to reasonably investigate consumer disputes.

118. Just in the last 12 months alone, Equifax, Trans Union and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

119. While the thousands of consumer complaints and millions of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

120. Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is

affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

121. Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

122. Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other

> sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

123. Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

124. In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[6] The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

125. The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the CRA Defendants did not meaningfully comply with the AG Settlement in these regards.

126. In early 2025, almost two decades after the AG settlement, the Consumer Financial Protection Bureau sued CRA Defendant Experian, seeking injunctive relief, redress, disgorgement, and civil money penalties. In its Complaint, CFPB alleged that:

> Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7 2025).[7]

---

[6] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[7] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf

127. As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process." *Id.*

128. Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[8]

129. The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

130. Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

[8] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

131. The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc*., which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher," PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum

of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

132. Proportionately similar to the litigation history against the CRAs, just in federal court alone, during the past decade, Capital One has been named as a defendant in approximately 2,800 consumer credit lawsuits, many of which alleged violations of the FCRA.

133. Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

134. Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

135. Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

136. Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

137. Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

138. Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

139. Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b) *against Equifax, Experian, and Trans Union*

140. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

141. Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Defendant Furnisher Capital One and the other inaccurate, fraudulent information described above.

142. As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681e(b) Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, costs associated with disputing the inaccurate information, severe anxiety and depression, insomnia, strain on Plaintiff's marriage, listlessness, crying spells, humiliation and embarrassment, harm to reputation, and loss of privacy.

143. Plaintiff has suffered denial of credit resulting from Experian and Trans Union including inaccurate information on her reports.

144. Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax, Trans Union, and Experian each ignored that information and did not use any human or substantive review to

confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

145. Equifax, Trans Union, and Experian each furnished multiple consumer reports to third parties containing the inaccurate collection information and they did so after receiving notice of these inaccuracies.

146. The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

147. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
***against Equifax, Experian, and Trans Union***

148. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

149. Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct reasonable reinvestigations to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the items from each of Plaintiff' credit files.

150. Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to Capital One and the other Furnishers all relevant information that they received with Plaintiff's disputes.

151. Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Capital One accounts and the other disputed Furnisher accounts.

152. Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff' credit files or modify the items of information upon a lawful reinvestigation.

153. Trans Union further violated 15 U.S.C. § 1681i(a)(5)(B) by reinserting previously deleted, inaccurate information into Plaintiff's credit file after her dispute without providing Plaintiff the notice of reinsertion required by the statute, as described above.

154. As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, costs associated with disputing the inaccurate information, severe anxiety and depression, insomnia, strain on Plaintiff's marriage, listlessness, crying spells, humiliation and embarrassment, harm to reputation, and loss of privacy.

155. Plaintiff has suffered denial of credit resulting from Experian's and Trans Union's failures to correct inaccurate information in her reports.

156. The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian

were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

157. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)**
***against Capital One***

158. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

159. Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished directly to it by Equifax, Experian, and Trans Union.

160. Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to Capital One.

161. As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: harm to her credit score and credit opportunities, costs associated with disputing the inaccurate information, severe anxiety and depression, insomnia, strain on Plaintiff's marriage, listlessness, crying spells, humiliation and embarrassment, harm to reputation, and loss of privacy.

162. The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

163. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(C)-(D)**
***against Capital One***

164. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

165. On one or more occasions within the past two years, by example only and without limitation, Capital One violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with the Defendant CRAs in response to her disputes without also including accurate notations that the debts were disputed and by failing to correctly report results of accurate investigations to the Defendant CRAs.

166. On information and belief, Plaintiff alleges that Capital One rarely if ever adds the correct notation indicating that the account is disputed when it responds to the e-Oscar ACDVs.

167. Plaintiff's disputes were, at minimum, bona fide.

168. As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: harm to her credit score and credit opportunities, costs associated with disputing the inaccurate information, severe anxiety and depression, insomnia, strain on Plaintiff's marriage, listlessness, crying spells, humiliation and embarrassment, harm to reputation, and loss of privacy.

169. Capital One was aware of the *Saunders v. Branch Banking & Trust* FCRA decision

by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

170. On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Capital One intended its employees or agents to follow.

171. On information and belief, Plaintiff alleges that Capital One's employees or agents did not make a mistake in the way they followed Capital One's procedures when they received, processed and responded to the Defendant CRAs' ACDVs and did not include a proper notation regarding the accounts being in dispute.

172. On information and belief, the Plaintiff alleges that Capital One has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

173. The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

174. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)**
***against Capital One***

175. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

176. Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from the CRAs and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Capital One's failures to investigate as articulated herein, after Capital One received notice of Plaintiff's disputes from the CRAs.

177. As a result of this conduct (the action and inaction of Capital One), Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, costs associated with disputing the inaccurate information, severe anxiety and depression, insomnia, strain on Plaintiff's marriage, listlessness, crying spells, humiliation and embarrassment, harm to reputation, and loss of privacy.

178. The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

179. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

**DEMAND FOR RELIEF**

Plaintiff therefore respectfully requests that this Court:

(1) Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Experian, Trans Union, and Capital One;

(2) Award Plaintiff attorney's fees and costs under the FCRA;

(3) Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4) Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

**GAIL KING**

By: /s/ *Leonard A. Bennett*

Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
Adam Short, VSB #98844
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

Nancy Kanter*
**PINE STREET LEGAL**
19 S. Pine Street
Doylestown, PA 18901
(215) 345-9214 – Telephone
Email: nkanter@pinestreetlegal.com
**Pro hac vice application forthcoming*

*Counsel for Plaintiff*